# UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS

## UNITED STATES

v.

## Matthew A. ROGERS
### Electrician's Mate Third Class (E-4), U.S. Coast Guard

### CGCMG 0302
### Docket No. 1391

### 8 July 2015

General Court-Martial convened by Commander, Ninth Coast Guard District.  Tried at Norfolk, Virginia, on 15 July 2013 and 16-23 September 2013.

| | |
|---|---|
| Military Judge: | CAPT Christine N. Cutter, USCG |
| Trial Counsel: | LCDR Benedict S. Gullo, USCG |
| Assistant Trial Counsel: | LT Nicholas G. Smith, USCGR |
| Defense Counsel: | LT James M. Belforti, JAGC, USN |
| Assistant Defense Counsel: | LCDR Angela J. Tang, JAGC, USN |
| Appellate Defense Counsel: | LT Philip A. Jones, USCGR |
| Appellate Government Counsel: | LCDR Amanda M. Lee, USCG |

### BEFORE
### McCLELLAND, GILL & CLEMENS
Appellate Military Judges

McCLELLAND, Chief Judge:

Appellant was tried by general court-martial composed of officer and enlisted members. Contrary to his pleas, Appellant was convicted of one specification of conspiracy to obstruct justice, in violation of Article 81, Uniform Code of Military Justice (UCMJ); one specification of false official statements, in violation of Article 107, UCMJ; two specifications of sexual assault, in violation of Article 120, UCMJ; and one specification of improper use of his military identification card, one specification of violating 18 U.S.C 499 by willfully allowing another person to have his military identification card, and three specifications of obstruction of justice, all in violation of Article 134, UCMJ.  The court sentenced Appellant to confinement for ten years, reduction to E-1, forfeiture of all pay and allowances, and a bad-conduct discharge.  The Convening Authority approved the sentence.

Before this Court, Appellant has assigned the following errors:

I.      The military judge erred in denying three defense challenges for cause.

II.     Trial counsel's improper argument was plain error.

III.    The evidence supporting Charge III, Specification 1, under Article 120, was insufficient. [1]

IV.     The military judge erred by allowing evidence of uncharged misconduct. [2]

V.      The sentence is inappropriately severe. [2]

VI.     Unlawful command influence contributed to the convictions. [2]

We heard oral argument on 18 March 2015 on the first and third issues. We summarily reject the fifth assignment and discuss the others. We set aside the convictions of two specifications under Article 134 on our own motion, and otherwise affirm.

## Summary of facts

Appellant was on a temporary assignment in Portsmouth, Virginia, when he encountered a woman at a bar across the street from his hotel. She was extremely intoxicated – literally falling-down drunk. Bar patrons and staff concerned for her well-being tried to ascertain her identity and her intended destination, but she was unable to respond coherently. Appellant intervened to falsely claim that he knew the woman and her husband and that he would escort her safely home. Seeking to vouch for his trustworthiness and assuage their skepticism, he offered his military identification card as a kind of collateral. In truth, Appellant had never met the woman or her husband and had no idea where she lived. Nor did he have any intention of ensuring her safe passage home. Rather, he escorted her from the bar to his hotel and brought her to his room. While he returned to the bar to retrieve his identification card, the woman, now naked, proceeded into a hotel stairwell and urinated and collapsed there. Upon his return to the hotel, the Appellant took the woman back to his room where, according to the court's findings, he committed two sexual acts upon her (placing his penis inside her mouth, and placing his

---

[1] The numbering of the charges and specifications in this opinion is as used at trial and reflected in the promulgating order, rather than as they were numbered in the charge sheets.

[2] Raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1981).

fingers inside her vagina), knowing that she was incapable of consenting due to impairment by an intoxicant. The next morning and again a week later, he wrongfully attempted to impede an investigation by making false statements about the incident to local police officers; the following month, he made a false official statement to a Coast Guard investigator.

The use of his military identification card was the basis of Appellant's conviction under Article 134 for misusing the identification card, and of violating 18 U.S.C. 499 by "willfully allow[ing] another person" to have it.

In a separate incident, according to the court's findings, Appellant conspired with a crewmate to provide his urine sample to the crewmate for a random urinalysis, and subsequently carried out the planned act.

### Challenges for cause

Appellant asserts that the military judge erred in denying defense challenges for cause against court members CDR K, CWO H, and Petty Officer B.

A military judge's ruling on an actual bias challenge is reviewed for abuse of discretion, and is afforded great deference. *United States v. Nash*, 71 M.J. 83, 88-89 (C.A.A.F. 2012); *United States v. Clay*, 64 M.J. 274, 276 (C.A.A.F. 2007). An implied bias challenge is reviewed pursuant to a standard that is less deferential than abuse of discretion, but more deferential than de novo review. *United States v. Peters*, 74 M.J. 31, 33 (C.A.A.F. 2015); *United States v. Napoleon*, 46 M.J. 279, 283 (C.A.A.F. 1997).

During voir dire examination, CDR K said she had been assigned to draft a sexual assault response and prevention operational plan as part of her duties on the Coast Guard Atlantic Area staff. The draft plan emphasized preventive measures. (R$_{16SEP}$ at 56, 73.) At the time of trial, her draft was complete and awaiting the Area Commander's signature. (R$_{16SEP}$ at 57.) While performing that duty, she had monitored news stories on sexual assault and read background materials on the subject. (R$_{16SEP}$ at 57, 59.) She did not deal with response to sexual assault complaints. (R$_{16SEP}$ at 56, 64, 70.) When asked about the rate of false claims of sexual assault,

she said she had read, probably in multiple sources, that the rate of false claims is about two percent, "and that's no different than any other crime statistic for false accusations." (R$_{16SEP}$ at 59, 62.) When asked if she could disregard those statistics and look at the facts of this case, she responded affirmatively, and added, "I know statistics can be maneuvered by whoever produces those statistics." (R$_{16SEP}$ at 73-74.) She also testified that a co-worker had been falsely accused of sexual misconduct and that she was mindful of the devastating consequences that ensue from false reports.

The specifications of sexual assault laid against Appellant alleged that the complainant "was incapable of consenting to the sexual act due to impairment by an intoxicant." The following dialog occurred during voir dire of CDR K:

> Q: [D]o you think it's possible for someone to have consensual sex and . . . be so intoxicated that they can't remember?
>
> A: My understanding is that if you are so drunk that you can't remember giving consent, then you are too drunk to give consent.
>
> Q: And where does that understanding come from?
>
> A: That's what our training says. That's what the Coast Guard teaches us in our sexual assault class.
>
> Q: Would it be hard for you to, I guess, change that perspective, or believe another perspective on that?
>
> A: If the law told me that someone could give consent when they were severely intoxicated, I would, you know, I'd follow the law.
>
> Q: But your training and your common sense maybe suggests otherwise?
>
> A: My understanding of . . . the law, as written right now, suggests otherwise.
>
> Q: So your belief is that the law says that if somebody is so drunk that they can't remember it, that means that they weren't able to give consent?
>
> A: . . . You'd have to work hard to make me believe that someone was so drunk they can't remember anything about the evening, that they were then also able to give consent. . . . That would have to be proven to me.

(R$_{16SEP}$ at 66-67.)

Later, she was asked, "You mentioned your understanding of the law regarding substantial incapacitation, or incapacitation to the point where one cannot consent. Are you able to disregard what you believe now, if the judge instructs you otherwise?" In consonance with her earlier statement that she would follow the law, she answered, "Yes." (R$_{16SEP}$ at 74.)

At trial, Appellant challenged CDR K for cause, arguing that her belief about the percentage of sexual assault false claims and her understanding of the law regarding capacity to consent to sex and subsequent lack of memory due to alcohol intoxication constituted both actual and implied bias.

Appellant now argues that CDR K "is the embodiment of the Coast Guard's fight to stop sexual assault in the Atlantic Area," (Assignment of Errors and Brief at 17) and that expecting her to serve as an impartial member was asking too much of both her and the system, invoking *United States v. Dale*, 42 M.J. 384, 386 (C.A.A.F. 1995). Appellant adds that CDR K's "preconceived notions about false claims and alcohol incapacitation" predisposed her to reject the defense arguments. (Assignment of Errors and Brief at 18.)

We reject Appellant's assertion of bias based upon CDR K's duty to draft a sexual assault prevention plan and her concomitant knowledge about sexual assault. Her role was unlike that of the base deputy chief of security in the *Dale* case, who was called the embodiment of law enforcement and crime prevention at the base. A deputy chief of security is surely involved in response to individual reports of crime, as well as street-level crime prevention. CDR K was not involved in response; her prevention role was performed at the policy level, not the street level. We do not see actual or implied bias flowing from her role and knowledge of sexual assault.

As for her belief about the rate of false claims, given her statement that she would disregard it and look at the facts of the case, there is no reason to attribute any bias to her. Likewise, she stated unequivocally, before being asked, that she would follow the law given to her regarding intoxication and capacity to consent to sex.

The military judge explained the law as she would apply it, at the outset of the session devoted to challenges. (R$_{16SEP}$ at 173.) She addressed both implied and actual bias in denying the challenge for cause against CDR K. (R$_{16SEP}$ at 184.) We see no error in her ruling.

CWO H and Petty Officer B both stated upon voir dire that if someone were convicted of sexual assault, that person should be discharged from the Coast Guard. (R$_{16SEP}$ at 126, 161) Both also stated that if they were instructed to look at the full range of punishments, they would do so. (R$_{16SEP}$ at 128, 129, 162, 163-64.) Both were challenged as having an inelastic attitude toward sentencing. The military judge denied the challenges.

Appellant points to *United States v. Giles*, 48 M.J. 60, 62 (C.A.A.F. 1998) to support his position that the challenges should have been granted. But unlike the member in *Giles*, neither member adhered to an inflexible position upon being asked if he would consider all the circumstances and the whole range of punishments. We see no error in the rulings.[3]

### Trial counsel's argument

Appellant points to several aspects of the Government's arguments (opening, closing, and rebuttal) that he claims were improper and prejudicial, amounting to plain error.

The test for determining the propriety of an argument is whether the argument was erroneous and whether it materially prejudiced the substantial rights of the accused. *United States v. Frey*, 73 M.J. 245, 248 (C.A.A.F. 2014) (citing *United States v. Baer,* 53 M.J. 235, 237 (C.A.A.F. 2000)). Where the defense fails to object to an argument, as was the case here, the court will grant relief for an improper argument only if it amounts to plain error. *United States v. Rodriguez*, 60 M.J. 87, 88 (C.A.A.F. 2004); *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001). To establish plain error, the appellant must show (1) that there was error, (2) that the error was plain or obvious, and (3) that the error materially prejudiced one of Appellant's substantial rights. *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005).

---

[3] The challenges asserted both actual and implied bias, but the nature of an inelastic attitude is actual bias; we do not see an implied bias issue in these two challenges.

Trial counsel repeatedly called Appellant a predator in his arguments. We do not view this term as inflammatory. We do view it as fair comment.[4]

At numerous points in argument, trial counsel used the term "we know," which Appellant claims constituted vouching for the credibility of the Government's evidence, citing *Fletcher*, 62 M.J. at 180. Appellant claims there are forty-two instances, but twelve of the instances he identifies were uses of the term by defense counsel. Many of trial counsel's uses of "we know" were not so much vouching as ironically contrasting Appellant's own conflicting statements; others merely referenced uncontroverted facts. In several instances trial counsel purported to speak for Appellant's knowledge. These usages are far from the examples of improper vouching in *Fletcher*. If there was error in trial counsel's use of "we know," it did not amount to plain error, especially since both parties indulged in it.

Trial counsel asserted that the mistake of fact defense "lacks credibility," which Appellant calls improper commentary. Appellant also claims that trial counsel disparaged defense counsel, describing a portion of the defense closing argument as "character assassination" of the complainant, calling defense lines of argument "distractions," and characterizing defense rhetoric as "justifications and excuses." We do not see any of these comments as personal disparagements of defense counsel. To a large degree, they described some natural parts of the defense's job in a case like this one, which defense counsel carried out with considerable aplomb. It was not improper for trial counsel to call attention to them. Appellant cites *Fletcher* to support his complaints. Again, these features of the Government's arguments bear almost no similarity to the examples in *Fletcher*.

In short, we see no plain error in trial counsel's argument.

### Charge III, Specification 1

Appellant claims that the evidence pertaining to Specification 1 of Charge III, most of which comes from his confessions to various people, does not support affirmative action by Appellant, as found in the language of the specification ("placed his penis inside [her] mouth").

---

[4] The defense argument addressed the issue effectively, ridiculing trial counsel's use of the term.

The test for legal sufficiency is whether, considering the evidence in the light most favorable to the Government, a reasonable factfinder could have found the elements of the offense beyond a reasonable doubt. *United States v. Turner*, 25 M.J. 324, 324 (C.M.A. 1987) (citing *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). The test for factual sufficiency is whether, after weighing all the evidence in the record of trial and recognizing that we did not see or hear the witnesses, this Court is convinced of Appellant's guilt beyond a reasonable doubt. *Turner,* 25 M.J. at 325; *see* Article 66(c), UCMJ.

The Government's Answer does not directly address Appellant's claim. However, at oral argument, the Government's position was that the voluminous evidence of the complainant's debilitated physical state constituted circumstantial evidence that for the oral sexual act to have taken place (as admitted by Appellant, e.g. "she . . . began giving me orale pleasure [*sic*]" (Prosecution Ex. 17)), affirmative action by Appellant must have occurred.

We agree with the Government's reasoning that the members reasonably could have inferred affirmative action by Appellant, so as to prove the specification as alleged, from the evidence. We find the evidence legally and factually sufficient.

### Uncharged misconduct

Appellant complains that the military judge allowed the Government to elicit testimony, over defense objection, indicating that Appellant engaged in intercourse with the complainant, which was uncharged.

The testimony at issue was part of a police officer's testimony describing Appellant's confession to him. The mention of intercourse was embedded in a short narrative about the incident: "He went to sleep. Woke up a short time later and she was performing oral sex on him. They had intercourse, sex, and he went and cleaned up again, and then went back to bed . . ." (R$_{18SEP}$ at 25.) In our view, the mention of intercourse was incidental and insignificant; if it was error to admit it, the error was harmless.

Appellant claims that trial counsel referenced "intercourse" in closing argument (Assignment of Errors and Brief at 34), but the citation to the record purporting to support this claim (R₂₁SEP at 102) is to the defense's closing argument, not the Government's. The other citation to closing argument he offers (R₂₁SEP at 144) finds trial counsel apparently admitting that intercourse did not occur, arguing that if the encounter had been consensual, there would have been intercourse. These citations do not support Appellant's argument that the mention of uncharged misconduct contributed to Appellant's conviction.

### Unlawful command influence

Appellant asserts that unlawful command influence from the Coast Guard's sexual assault training and "the Commandant's State of the Coast Guard brief" resulted in his conviction.

The issue of unlawful command influence was raised before trial by a motion to dismiss Charge II and its specifications (called Charge III at trial and in this opinion) – violation of Article 120, UCMJ. (Appellate Ex. XV.)[5] The instruments of command influence alleged at that time were a Presidential speech and Congressional testimony by the Commandant of the Coast Guard on 4 June 2013 titled "Pending Legislation Regarding Sexual Assaults in the Military," as well as statements by persons not in the Coast Guard chain of command (congresspersons and officials of the Departments of Defense and Navy).

The Commandant's congressional testimony included the following passage:

> As the President has said, there is "no silver bullet" to solving the blight of sexual assault within our ranks. But we will continue our efforts until every victim feels confident in the ability to report sexual assault; every service member feels a duty to intervene and protect; every leader is focused on a command climate intolerant of sexual assault; and every crime is vigorously investigated and prosecuted, and justice is done. We will continue until sexual predators are driven from our service.

> Our goal is simple – to eliminate the crime of sexual assault from our service and ensure that no Coast Guard man or woman ever needs to fear the crime of sexual assault from a Shipmate.

---

[5] The Government's response at trial was Appellate Exhibit XVI.

(Appellate Ex. XV, Encl. 3.)  By its nature, this testimony was addressed to the Congress, not to members of the Coast Guard, and it did not purport to provide a general "state of the Coast Guard."  It is not clear whether Appellant is now referring to this testimony in raising the unlawful command influence issue before this Court.

There is an annual State of the Coast Guard address, which is directed toward members of the Coast Guard.  It is possible that Appellant is referring to this address; if so, the most relevant edition would be the one that preceded his trial.  The Commandant's State of the Coast Guard Address delivered on 27 February 2013 included the following passage pertaining to sexual assaults:

> While I am incredibly proud of all of the things we've done to keep our Service sound, we still must eliminate those things that have no part in our Coast Guard: sexual assault, hazing, harassment, and alcohol abuse – or any other activity that is contrary to our Core Values. These behaviors undermine our morale, degrade our readiness, damage our mission performance, and break our obligation to one another and our nation.
>
> As I told you in Shipmates Message 19, as Coast Guardsmen we each have a duty to respect our Shipmates. And that duty demands courage.
>
> And we are making progress. Our Sexual Assault Prevention and Response Task Force completed a year of work to identify the problems – and propose solutions. Our Sexual Assault Prevention Council will direct implementation of the Task Force recommendations and coordinate service-wide efforts to eliminate sexual assault from our Service.
>
> We are emphasizing education and training, improving our response capability and victim support network, and ensuring accountability for those who engage in this violent crime – or those who allow it to occur.
>
> Remember, there are no bystanders in our Coast Guard. I need all of you to help me with this.
>
> We will eliminate sexual predators from our midst. We will protect our shipmates and hold predators accountable. And I reject the assertion of some experts that sexual assault is an unavoidable element of military service culture. Not in my Coast Guard.

(http://www.uscg.mil/history/ccg/Papp/SPEECHES/2013-02-27%20State%20of%20the%20Coast%20Guard%202013(1).pdf.)

Neither of these texts can be fairly called direct evidence of unlawful command influence. There was no other direct evidence of actual unlawful command influence, and some evidence refuting it. The military judge denied the motion before trial, specifically addressing referral of the charge to trial, but allowed that other aspects of unlawful command influence – chilling witnesses' testimony, or sentencing attitudes or bias on the part of members – could arise during trial. (Ruling on "Defense Motion for Appropriate Relief (dismissal based on unlawful command influence)" dated 19 August 2013, Appendix A to Government's Motion to Attach Documents dated 19 June 2014, attached to the record by this Court's order dated 26 June 2014.)

At trial, the motion was renewed after voir dire of the members. (R$_{16SEP}$ at 174-180.) At that time, the defense called to the military judge's attention that most of the members had indicated they felt someone should be discharged if convicted of the charges at issue, and asserted that this was "additional evidence of UCI in this case." (*Id.* at 174.) The defense also pointed out that some of the members "thought it was impossible for somebody to consent to sex and then later not remember it due to alcohol intoxication. (*Id.* at 175.) The defense asserted that those members credited this belief to the training they had received, which "is all coming down from the top brass in the Coast Guard." (*Id.* at 176.) The military judge denied the motion, stating that she had seen nothing to indicate that the members "were influenced by higher command authority on the question of discharge;" and that any incorrect beliefs on alcohol consumption and consent should be addressed by requesting a specific instruction. (*Id.* at 180.)

We agree with the military judge that there was no evidence of unlawful, or any, command influence concerning discharge as a sentence component, and we see no evidence of unlawful command influence in creating beliefs on alcohol consumption and consent. We agree, too, that incorrect beliefs would not disqualify a prospective member but would be a matter for instructions. The fact that no instructions on the subject were requested or given does not retroactively affect the qualifications of members or establish unlawful command influence. We see no substance to the claim of unlawful command influence, and no error in the military judge's rulings on the matter.

**Inadequate specifications**

In Charge IV, Specification 1, the Government alleged that Appellant did "represent himself as a member of the U.S. Coast Guard and use his U.S. Coast Guard military identification card to gain sole control and responsibility for [MC], who was severely intoxicated, for the purpose of sexually assaulting [MC] in the accused's hotel room, which conduct was to the prejudice of good order and discipline and was a nature to bring discredit upon the armed forces." The court found Appellant guilty of the specification, except for the words "for the purpose of sexually assaulting [MC]."

It is clear to us that the specification of which Appellant was found guilty by exceptions does not state an offense.[6] We will set aside that finding of guilty. We are certain that this specification made no difference to the sentence.

In Charge IV, Specification 5, Appellant was convicted of a specification under Article 134, UCMJ, that includes no "terminal element" (i.e., prejudice to good order and discipline, service discredit, or a "crime or offense not capital"). This raises an issue. *See United States v. Fosler*, 70 M.J. 225, 233 (C.A.A.F. 2011) (in a specification under Article 134, "the terminal element must be set forth . . . ."). The specification alleged obstruction of justice in an administrative proceeding by providing his own urine sample to another servicemember who used it to replace or otherwise conceal his own sample during a random urinalysis.

Fundamentally, a specification must allege every element of the charged offense expressly or by necessary implication. Rule for Courts-Martial 307(c)(3), Manual for Courts-Martial, United States (2012 ed.); *Fosler*, 70 M.J. at 229. A charge or specification that is defective because it fails to allege an element of an offense, if not raised at trial, is tested for plain error. *United States v. Ballan*, 71 M.J. 28, 34 (C.A.A.F. 2012). For plain error, there must be material prejudice to a substantial right as well as plain or obvious error. *Id.* (citing *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)). A conviction of a defective specification implicates the Constitutional right to notice. *United States v. Humphries*, 71 M.J. 209, 215 (C.A.A.F. 2012). It hardly needs to be said that the right to notice is a substantial right.

---

[6] We express no opinion on the sufficiency of the original specification.

Specification 5 of Charge IV does not allege a terminal element. This was plain and obvious error. *Id.* at 214 (citing *Ballan* and *Fosler*). No objection was raised at trial to the sufficiency of the specification. Accordingly, we apply the plain error standard to determine whether a remedy is required. Given the plain and obvious error, the question is whether notice of the missing element can be found in the trial record, so as to negate prejudice to the Constitutional right to notice.[7]

In this record, mention of the terminal elements of prejudice to good order and discipline and service discredit is found first in the instructions on findings given before closing arguments.[8] In those instructions, the elements of Specification 5 of Charge IV include a terminal element of both prejudice to good order and discipline and service discredit. ($R_{21SEP}$ at 31.) Coming after the close of evidence, this was too late to negate prejudice. *See Humphries*, 71 M.J. at 216.

We will set aside the finding of guilty of Specification 5 of Charge IV. We are certain that this specification made no difference to the sentence.

### Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings of guilty of Charge IV, Specifications 1 and 5, are set aside and the specifications are dismissed. The other findings and the sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, those findings of guilty and the sentence, as approved below, are affirmed.

Judges GILL and CLEMENS concur.

---

[7] Prejudice would also be negated if the element was uncontroverted. *Humphries*, 71 M.J. at 215-16. However, in the absence of a defense acknowledgment of the element, which might anyway indicate that the defense had notice of the element, it is not clear what would constitute "uncontroverted" so as to negate prejudice.

[8] Before the instructions were delivered to the members, but after both parties had rested, there was discussion about, apparently, draft instructions that the military judge had given to counsel. The record contains, beginning at $R_{21SEP}$ 3, reference to the terminal elements "prejudice to good order and discipline" and "service discrediting," but it is not clear which specifications are being discussed, and there is no copy of those draft instructions entered into the record as an appellate exhibit. However, even if notice could be found at this point, it would be too late, coming after the evidence had closed.



For the Court,

Shelia R. O'Reilly
Clerk of the Court